IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **F&F CUSTOM BOATS, LLC,** x | |
| **individually and on behalf of all others** : | |
| **similarly situated,** : | |
| : | **JURY TRIAL DEMANDED** |
| **Plaintiff,** : | |
| : | **CLASS ACTION COMPLAINT** |
| **-against-** : | |
| : | |
| **GOLDMAN SACHS GROUP, INC.,** : | |
| **GS POWER HOLDINGS LLC,** : | |
| **METRO INTERNATIONAL** : | |
| **TRADE SERVICES LLC,** : | |
| **LONDON METAL EXCHANGE** : | |
| **LIMITED; LME HOLDINGS** : | |
| **LIMITED; and JOHN DOES 1-10** : | |
| : | |
| **Defendants.** : | |
| x | |

## CLASS ACTION COMPLAINT

Plaintiff complains, upon knowledge as to itself and its own acts, and upon
information and belief as to all others:

### I.      INTRODUCTION

1.      This is an antitrust case concerning aluminum. Plaintiff's claims arise from
Defendants' combination, conspiracy or agreement with one another and other persons to
restrain aluminum supplies in Goldman's London Metal Exchange (LME) Detroit warehouses
to inflate aluminum prices, including the Midwest Price Premium.[1]

2.      Plaintiff's Complaint alleges claims for two proposed classes (the "Classes").
First, on behalf a Nationwide Class, Plaintiff seeks redress for Defendants' violations of
Section 1 of the Sherman Act, 15 U.S.C. § 1, entitling Plaintiff and the Nationwide Class to

---

[1]      The Midwest Price Premium is defined in Section III, and includes the cost of freight and handling to
ship aluminum from LME warehouses to the Midwest United States, including to Arkansas.

injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. Second, for a Class composed of Arkansas residents, Plaintiff seeks redress for Defendants' violations of the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-101 *et seq.* and Arkansas's common law, entitling Plaintiff and members of the Arkansas Class to money damages and injunctive and equitable monetary relief, including disgorgement.

## II.   JURISDICTION AND VENUE

4.   This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages, restitution or other forms of equitable monetary relief under state law, and to recover costs of suit, including reasonable attorney's fees, for the injuries Plaintiff and all others similarly situated sustained.

5.   This Court has jurisdiction over the federal claim under 28 U.S.C. §§ 1331 and 1337. This Court has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim they form part of the same case or controversy. This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5 million, and there are members of the Class who are citizens of a different state than the Defendants.

6.   The Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold aluminum throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States including this District.

7.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391. During the Class Period members of the Nationwide Class resided in this District, one or more Defendants, transacted business, was found, or had agents in the District and a portion of the events establishing the claims arose in this District.

8.     The activities of the Defendants and their co-conspirators, were within the flow of, intended to, and had a substantial effect on the foreign and interstate commerce of the United States. Defendants' conduct further substantially affected commerce in Arkansas, and Defendants and their co-conspirators have availed themselves of the benefits of Arkansas's laws such that Arkansas law can properly apply to the state law claims asserted.

## III.     DEFINITIONS

8.     As used, the term "Midwest Price Premium," means and includes the Platts MW Midwest Premium, Midwest Premium or Midwest Transaction premium price, and similar terms, which reflect a standard contract benchmark price term for purchasing and selling physical aluminum in the Midwest United States including Arkansas.

9.     As used, the phrase "Class Period" means the time extending from February 1, 2010 to present.

## IV.     PARTIES

10.     Plaintiff F&F CUSTOM BOATS, LLC ("Plaintiff") in an Arkansas Corporation, with a principal place of business in Monticello, Arkansas. Plaintiff was damaged in its property and business by purchasing aluminum pursuant to a contract term based on the Midwest Price Premium, which Defendants' intentionally and directly inflated throughout the Class Period.

11.    Defendant GOLDMAN SACHS GROUP, INC. ("Goldman Sachs") is a leading global investment banking, securities and investment management firm that provides a wide range of financial services to a substantial and diversified client base. Goldman Sachs is located at 200 West Street, New York, New York 10282.

12.    Defendant GS POWER HOLDINGS LLC ("GS Power Holdings") is a significant subsidiary of Goldman Sachs Group, Inc. GS Power Holdings is located at 85 Broad Street, New York, New York 10004.

13.    Defendant METRO INTERNATIONAL TRADE SERVICES LLC ("Metro International") is a global warehouse operator, specializing in the storage of non-ferrous metals, including aluminum, for the LME. Metro International is an LME-approved warehouse. Goldman Sachs acquired Metro International in February 2010 and Metro International operates as a subsidiary of GS Power Holdings LLC. As of March 8, 2013, Metro International operated 29 out of 37 LME-listed storage facilities in Detroit, Michigan. The headquarters of Metro International is at 6850 Middlebelt Road, Romulus, Michigan 48174.

14.    Goldman Sachs, GS Power Holdings, and Metro International are sometimes the "Goldman Defendants."

15.    Defendant the LONDON METAL EXCHANGE LIMITED ("LME") is the world center for the trading of industrial metals. LME's trading platforms have Eighty Percent (80%) of all non-ferrous metal futures business. The LME connects participants from the physical industry and the financial community to create a market for buyers and sellers, and provides producers and consumers of metal with a physical market of last resort and the ability to hedge against the risk of rising and falling world metals prices. The LME also has a

large network of storage units for its commodities, including aluminum. The LME is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom and does business in the United States and this District, including through meetings held United States to encourage use of LME contracts, and storage operations through its approved warehouses that hold most United States' aluminum.

16.     Defendant LME HOLDINGS LIMITED is a corporation that, until December 6, 2012, owned the LME. Defendant Goldman Sachs and other leading American banks including JPMorgan, Citigroup, Merrill Lynch and Morgan Stanley owned the largest portion of LME Holdings Limited. On December 6, 2012, the LME was acquired by Hong Kong Exchanges & Clearing, Ltd. ("HKEx").

17.     John Doe Defendants 1-10 are other persons who own warehouses, have similar financial interests as the Goldman Defendants, and have otherwise entered into the illegal conspiracy alleged herein.

18.     The LME Defendants, the Goldman Defendants, and the John Doe Defendants are sometimes called the "Defendants."

19.     The acts charged have been done by some or all of Defendants and their co-conspirators. Alternatively, the acts charged were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaging in the management of each Defendant's business or affairs.

## V.    CLASS ALLEGATIONS

20.    Plaintiff sues as a class action under Rule 23 of the Federal Rules of Civil
Procedure for itself and a Nationwide Class (the "Nationwide Class") composed of and
defined:

> All persons and entities residing in the United States who, from
> February 1, 2010 to the present, purchased aluminum pursuant to a
> contract with a price term based, in any part, on the Midwest Premium
> or Platts MW Premium or similar terminology, including but not limited
> to an averaging over a period of days of any such premium. Excluded
> from this Class are Defendants, any parent, subsidiary, affiliate, agent,
> or employee of any Defendant or Co-Conspirator. Also excluded are
> any federal, state or local governmental entities, any judicial officer
> presiding over this action and the members of his/her immediate family
> and judicial staff, and any juror assigned to this action.

21.    Plaintiff also sues as a class action under Rule 23 of the Federal Rules of Civil
Procedure for itself and a Class composed of Arkansas residents (the "Arkansas State Class")
regarding the claims it brings under Arkansas law:

> All persons and entities residing in Arkansas who, from February 1,
> 2010 to the present, purchased aluminum pursuant to a contract with a
> price term based, in any part, on the Midwest Premium or Platts MW
> Premium or similar terminology, including but not limited to an
> averaging over a period of days of any such premium. Excluded from
> this Class are Defendants, any parent, subsidiary, affiliate, agent, or
> employee of any Defendant or Co-Conspirator. Also excluded are any
> federal, state or local governmental entities, any judicial officer
> presiding over this action and the members of his/her immediate family
> and judicial staff, and any juror assigned to this action.

22.    Plaintiff reserves the right to amend or modify these Class definitions in a
motion for class certification and/or the result of meaningful discovery.

23.    This action has been brought and may be properly maintained as a class action
under Rule 23 of the Federal Rules of Civil Procedure for the following reasons for the
Nationwide Class and the Arkansas State Class:

> a.    The Classes are ascertainable and there is a well-defined
> community of interest among the members of the Classes;

b.  The Classes are so numerous that joinder of all members is impracticable;

c.  Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff's claims arise from the same common conduct establishing the claims of the members of the Classes and the relief sought is common to the Classes;

d.  Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. Among the common questions of law and fact are:

(1)  Whether Defendants monopolized, attempted to monopolize or conspired to monopolize in violation of law;

(2)  Whether Defendants made agreements in unreasonable restraint of trade;

(3)  Whether Defendants combined, conspired and agreed to restrain supplies or inflate prices of aluminum, including the Midwest Premium, or Platts MW Premium portion;

(4)  Whether such violations inflated such prices of aluminum;

(5)  Whether such inflation caused antitrust injury to the property of Plaintiff and members of the proposed Classes;

(6)  Whether Defendants' conduct violates the ADTPA;

(7)  Whether Defendants were unjustly enriched;

(8)  Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

(9)  Whether injunctive relief enjoining the reoccurrence of Defendants' conduct and/or declaratory relief that such conduct is unlawful, is warranted.

e.  Plaintiff will fairly and adequately protect the interests of the Classes in that Plaintiff has no interests that are antagonistic to other members of the Classes and have retained counsel competent and experienced in

the prosecution of class actions and antitrust litigation to represent themselves and the Classes;

f.   A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all members of the Classes is impractical; the damages or injuries suffered by individual Class members are relatively small absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them;

g.   Defendants have acted, and refused to act, on grounds applicable to the Classes, making appropriate final injunctive relief regarding the Classes as a whole; and

h.   Absent a class action, Defendants would be unjustly enriched because they could retain the benefits and fruits of their wrongful conduct.

## VI.   RELEVANT MARKET

24.   Plaintiff disclaims any need to plead a relevant market on the Section 1 claim because the restraint of trade here directly inflated price, restricted supply, anti-competitively restrained free alienability of aluminum, and otherwise constitutes a per se violation of Section 1.

25.   Alternatively the Relevant Markets are one or more following:

a.   The market for providing exchange-traded aluminum forward or futures contracts, including to approved warehouses for exchange-traded aluminum in the United States. The LME has had 97-99% of the aluminum futures contract trading and has had the power to approve the warehouses holding 95-100% of the aluminum for such trading.

b.   The market for warehouse storage of aluminum in the United States in LME Warehouses or the market for warehouse storage of that portion of both LME warehouse aluminum and non-LME warehouse aluminum in areas in which purchase and sale contracts for aluminum are based on the Midwest Premium or the Platts MW Premium price. The growing aluminum in the LME Warehouses in the United States is estimated to constitute approximately 50% or more of the fluctuating total amounts of aluminum stored by warehouses in the United States. That percentage is even higher for aluminum stored in places that transact at Midwest Premium or Platts MW Premium prices.

c.   The LME has the power to control or agree to the terms and operations of its warehouses that hold all the LME aluminum in the U.S. Such warehouses also hold a large portion of all LME and non-LME aluminum stored by warehouses in the U.S. The geographical market for the foregoing product markets is the entire United States.

## VII.   VIOLATIONS ALLEGED

### A.   The LME's Metro International Detroit Aluminum Warehouses.

26.   The LME is the global market for trading aluminum, bringing together industry and financial participants to create a market for buyers and sellers. LME's trading market gives aluminum producers and consumers the ability to hedge against the risk against the rise and fall of aluminum prices. LME held a monopoly on trading aluminum forward or futures contracts in the United States, representing 97-99% of the trading market. Goldman could direct, as traders and intermediaries, large amounts of business to or away from the LME.

27.   Goldman was the second largest shareholder of LME, holding 1.23 million or 9.5% of its shares.

28.   The LME also certifies warehouses for the aluminum traded on its market. LME certifies these warehouses, and the LME makes agreements with the owners of the warehouses. LME has the right to approve any LME warehouse, the output of aluminum from the LME-approved warehouses, and the storage rates for LME-approved warehouses.

29.   Among other places, LME-certified warehouses are in the Detroit, Michigan area. Metro International owned 27 industrial warehouses (80% of the total LME Warehouses) in the Detroit area. During the time Metro International owned these warehouses, it took about six weeks to extract metal from the warehouses for delivery to

customers.

30.     In February 2010, Goldman purchased Metro International for a reported $550 million, acquiring their LME-certified warehouses in Detroit, and the largest aluminum cache in the world. When Goldman purchased Metro International, it owned 29 of the 37 LME-listed warehouses holding 919,000 tons of aluminum in Detroit. With this acquisition, Goldman stores well over 50% of the aluminum in parts of the United States that transact using the Midwest Premium of Platts MW Premium. Goldman also controlled the output of LME-approved aluminum from LME Detroit Warehousing by controlling the rate at which Goldman loads-out aluminum above the agreed-upon minimum load-out rate.

**B.      Goldman's Operation of the Detroit LME Warehouses.**

31.     In 2008 Metro International's stores of aluminum represented about 50,000 tons. By 2010, the stores had grown to 850,000 tons. Goldman steadily increased the aluminum stored in the Detroit LME Warehouses:

| Time | Tons |
|------|------|
| End of February 2011 | 1,081,000 |
| End of February 2012 | 1,428,475 |
| End of September 2012 | 1,476,225 |
| End of June 2013 | 1,458,075 |

32.     During the same time, the aluminum stored in LME Warehouses outside of Detroit declined by 50%.

33.     Goldman agreed with LME it would release a minimum of 1,500 tons of metal per city per day. It also agreed with LME the 1,500-ton-release minimum would not be a percentage of warehouse capacity, supply, net out load-ins, or be warehouse-specific.

34.     Goldman then agreed with the LME the 1,500-ton-release minimum would be a 1,500-ton-release maximum.

35.     To increase the tonnage and length of time of the aluminum store in its LME

Detroit Warehouses, Goldman offered firms $250 or more per ton to store aluminum for longer periods. Goldman also earned around $378,000 a day in rental costs, charging a storage fee of 42¢ per ton per day .The storage fee increased 10% from 2010 to 2012. LME reportedly receives 1.0% of the total storages fees and revenues realized from the LME Detroit Warehouses.

36.     In the first half of 2011, the LME Detroit Warehouses took in over 350,000 tons of aluminum and only delivered 171,350 tons.

37.     By June 2013, it took up to sixteen months for a customer to receive their aluminum from the Detroit LME Warehouses between customer order and delivery. Goldman would also shuttle, or make agreement that would encourage Goldman to shuttle aluminum from warehouse to warehouse in Detroit.

**C.     Customer Complaints.**

38.     In 2011, a senior metals analysis noted "If you take Detroit in particicular, those warehouses historically extracted metal at a faster rate . . . the infrastructure is there."

39.     Novelis, the world's largest producer of rolled aluminum sheet, through its chief procurement officer, noted:

> I don't know the specific details of every warehouse but our view is that they seem to be able to absorb metal coming in at almost an infinite rate so we feel there's a lot more they can do on the output side to push up the (load out) rates . . . [i]t's driving up costs for the consumers in North American and it's not being driven up because there is a true shortage in the market . . . [i]t's because of an issue of accessing metal . . . in Detroit warehouses.

40.     In June 2011, a metals analyst in Longon at Credit Agricole described the situation as "mak[ing] a mockery of the market" and an "anticompetitive situation."

41.     On June 21, 2011, Jorge Vazquez, a senior vice president at Harbor Intelligence, noted the slow rate of load-outs in the Detroit LME Warehousing was "one of

the factors that, without a doubt, is behind record high Midwest premiums."

42.     Coca-Cola Co.'s procurement officer Dave Smith complained "the situation has been organized artificially to drive premiums up . . . it takes two weeks to put aluminum in, and six months to get it out."

43.     In 2011, Co-Cola Co. lodged a complaint with the LME in response to Goldman's supply bottlenecks.

44.     In June 15, 2012, HKEx announced the purchase of the LME for $2.15 billion ($208 million representing Goldman's stake in LME). HKEx's CEO, Charles Li, stated in October 2012 that the supply bottlenecks were a "level-one issue" and if the "LME system is making clients suffer [through bottlenecks it] is not acceptable." Before Goldman sold the LME to the HKEx, Goldman looked to enrich their holdings rather than to efficiently deliver and market commodities.

45.     On February 1, 2013, Novelis "lost patience with LME's [failures] to tackle access problems."

46.     On February 26, 2013, analyst Duncan Hobbs said changes in the LME rules "will make no difference to access to dominant metal stocks in [LME Detroit Warehouses]."

**D.      Goldman and LME's Initial Response to the Complaints.**

47.     Goldman first responded to complaints that it was observing its obligations with and the rules of the LME.

48.     In the latter half of 2011, the LME publically discussed increasing the load-out rate to 3,000 tons for LME Detroit Warehousing.

49.     But Goldman and LME continued to agree the minimum-load-out rule should be a maximum load-out rule, there should be no percentage shift in each warehouse, and the load-out rule should be per city and not per warehouse.

50.     On April 1, 2012, LME and Goldman agreed to change the load-out to 3,000 tons per day per city for the LME Detroit Warehousing.

51.     Goldman increased its storage rates in 2012 and 2013 by justifying it to reduce the delays of load-outs in the LME Detroit Warehouses.

52.     In January 2013, the LME announced that purchasers of aluminum should stop paying high prices and "the solution must come from the market itself."

53.     On April 1, 2013, LME and Goldman agreed to change the load-out to 3,500 tons per day per city for the LME Detroit Warehousing and increase the storage costs by 6.6%.

54.     On June 7, 2013, Martin Abbott announced his resignation as the CEO of LME.

55.     On July 1, 2013, the LME (now owned by HKEx) proposed load-out rules forcing warehouses with 100-day queues to deliver 1,500 tons of metal each day morethan is brought it.

56.     On July 31, 2013, Goldman finally acknowledged "consumers should not have to wait unusually long times to get the metal they store in warehouses" and it was contacting customers waiting for aluminum to get them "immediately available aluminum." On this same day, Goldman's President said "Metro does what it is told to do by the customers who own the metal" and "to the extent metal is moving it is at the direction of the client," and it felt "horrible for customers if they can't get metal . . . we don't believe that to be the fact."

57.     In July 2013, Goldman acknowledged it was suspending incentive payments made to attract metal to their LME Detroit Warehousing.

**E.     Government Investigations.**

58.     In November 2012, the European Union began a review of the LME's

warehousing arrangements, following complaints from the aluminum industry.

59.     On April 1, 2013, Scott Evans, Goldman's head aluminum trader resigned.

60.     On August 13, 2013, the United States Commodities Futures Trading Commission subpoenaed documents from Goldman relating to their LME Detroit Warehousing of aluminum.

61.     The United States Department of Justice has reportedly started a preliminary probe into the metals warehousing industry.

62.     Ohio Senator Sherrod Brown promised Congressional hearings to determine if banks are manipulating aluminum prices.

**F.      Effect on the Midwest Price Premium.**

63.     During the Relevant Period, the Midwest Price Premium has increased to all-time record highs:

| Date | Price |
|------|-------|
| February 2010 | 6.14 ¢ per pound |
| February 2011 | 6.35 ¢ per pound |
| June 2011 | 8.81 ¢ per pound |
| February 2013 | 11.65 ¢ per pound |
| After February 2013 | 12.00 ¢ per pound |

**G.      The Goldman Defendants' Monopoly Power**

64.     Goldman has had monopoly power in the Relevant Markets alleged in Goldman warehouses with 80-plus percent of the LME Detroit Warehousing space. Goldman can control the output of LME-approved aluminum from LME Detroit Warehousing by controlling the rate at which Goldman loads-out aluminum above the agreed-upon minimum load-out rate.

65.     With knowledge from public complaints since 2010 or early 2011 it was inflating aluminum prices, Goldman has converted the minimum load-out rule into a

maximum load-out rule and agreed with the LME to convert the minimum into a maximum. Goldman reportedly further abused such power by shuttling aluminum from one warehouse to another within the Detroit area to use up the minimum quota causing no output of aluminum from the warehouses to the public. Subsidized and incentivized by its monopoly profits from its foregoing abuses, Goldman has made diversion agreements in which it has paid as much as $250 per ton or more to divert more aluminum into the LME Detroit Warehousing. Goldman has abused its monopoly power, the LME has abused its monopoly power, and Goldman and the LME have agreed to abuse their monopoly power in order to anti-competitively and restrictively to divert aluminum into and limit unreasonably the free alienability of aluminum stored, in LME Detroit Warehousing. Defendants have inflated aluminum prices including the Midwest Premium or Platts MW Premium price and the storage costs paid directly to the Goldman Defendants, part of which is paid to the LME.

66.     Unless enjoined as alleged, Defendants' ongoing agreement in restraint of trade and abuse and conversion of their monopoly power will spread to other LME Warehouses, further exacerbating the anticompetitive impact on the U.S economy.

## VIII.   EFFECTS ON INTERSTATE COMMERCE AND INJURY TO PLAINTIFF AND CLASS MEMBERS

67.     Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiff and all Class members.

68.     Defendants' unlawful acts alleged have had a substantial anticompetitive effect on interstate commerce within the United States including by inflating aluminum prices, restraining aluminum, reducing the effective availability of the supplies of aluminum in LME Detroit Warehousing and beyond.

69.     For one example, Defendants' unlawful agreement has caused purchasers of

aluminum in the United States whose purchase contracts specify the Midwest Premium or the Platts MW Premium, as a component of the purchase price under the contract, to pay an unlawfully inflated and anomalously increasing premium to purchase aluminum.

70.   Because of Defendants' violations, Plaintiff and the members of the Classes have been damaged in their property or business, and have paid supra-competitive prices. The Defendants' restraint of trade and anticompetitive conduct had severe adverse consequences on competition, prices, the quality of storage services, efficiency in storage services, and the level of available output of aluminum. Plaintiff and other members of the Classes were deprived of normal, competitive aluminum prices. Instead, they were subjected to artificially determined prices and price trends as a direct, foreseeable and intended result of Defendants' unlawful and manipulative conduct. Consequently, Plaintiff and the Class members suffered financial losses and were, therefore, injured in their business or property.

## IX.   ACTIVE CONCEALMENT

72.   Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiff and members of the Classes. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance, and actively concealed their activities through various other means and methods to avoid detection. Plaintiff and members of the Classes did not discover, and could not have discovered through exercising reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged until shortly before this class action litigation was commenced.

73.     Because of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all statutes of limitations otherwise applicable to the allegations have been tolled.

## X.     CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**For the Nationwide Class –
Violation of Section 1 of the Sherman Act**

74.     In violation of Section 1 of the Sherman Act, Defendants entered into an agreement in unreasonable and extreme restraint of trade which intentionally, directly and foreseeably inflated prices for aluminum in the United States, including, the Midwest Premium or Platts premium component of prices. This inflated the price of aluminum products.

75.     Defendants' conduct constitutes a *per se* violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

76.     The Defendants agreed to and abused their respective monopoly powers over essential areas of commerce involving warehousing and futures trading.

77.     Defendants made the foregoing agreements to engage in the anticompetitive conduct alleged, inflate aluminum prices, including the Midwest Premium or Platts MW Premium prices of aluminum, and inflate Defendants' profits and revenues. Defendants' agreements did so, and unreasonably restrained trade.

78.     Defendants' agreements constituted unreasonable restraints of trade for many reasons, including :

        a.  Diversion Agreements.    To restrain aluminum supplies in LME Detroit
            Warehousing, Goldman first had to overbid and drive up prices in the markets
            for physical aluminum based upon the Midwest Premium or Platts MW
            Premium. As repeated public complaints told Defendants, Defendants'

diversion agreements and other steps were inflating the Midwest Premium to all-time-record levels to attract aluminum in LME Detroit Warehousing. That is, Defendants first injured and made targets of purchasers of aluminum at the Midwest Premium or Platts MW Premium price, to ship more aluminum into and restrain it in Detroit LME Warehousing.

b. <u>Inefficiency Agreements.</u>  Defendants established a load-out minimum on a per city rather than a per warehouse basis such that, in industrial centers, the agreements could be perverted into self-perpetuating feedback loops of greater and greater load-out backlogs and longer storage times.

c. Defendants established the minimum load-out based upon an absolute number rather than percentage of capacity of the warehouses, or percentage of the supply in the warehouse basis. In industrial centers, the agreements could be perverted into self-perpetuating feedback loops of greater and greater load-out backlogs and longer storage times.

d. Defendants established a minimum load-out rule based upon a gross number rather than a net number that subtracted load-ins. The agreement could be perverted into self-perpetuating feedback loops of greater and greater backlogs and longer storage times.

e. Defendants agreed to transform the minimum load-out requirement, in times of high storage, into a maximum load-out requirement., in commercial centers the agreements could be perverted into self-perpetuating feedback loop of greater load-out backlogs and longer storage times.

f. Defendants agreed to a maximum load-out rate that was $1/6$ — $1/20$ of an efficient rate of load-outs such that Goldman and the LME could be rewarded for extreme inefficiency with the longer duration of storage revenues from each customer., they could leverage such inefficiency into a self-perpetuating feedback loop of greater load-out backlogs and longer storage times.

g. Defendants agreed to terms that allowed Goldman to subvert even the extremely unreasonably high maximum load-out agreement, by shuttling aluminum back and forth from warehouse to warehouse.

h. Defendants agreed to storage rates much higher than competitive storage rates and agreed that *quid pro quo* increases in storage rates to even higher supra-competitive levels would be made to compensate for any reduction in the extreme unreasonableness of the minimum (in reality, the maximum) load-out rate.

i. Defendants agreed to leverage their supra-competitive revenues obtained from all the foregoing by Goldman's diversion agreements alleged in (a) above, which further added to the aluminum in storage in LME Detroit Warehousing., in industrial centers, Defendants' agreements could be further perverted into

self-perpetuating feedback loops of greater load-out backlogs, longer storage times, and cause continually higher aluminum prices.

j.   Defendants agreed, as a necessary, intended and direct effect and inextricably intertwined part of their foregoing conduct, to inflate prices for aluminum including the Midwest Premium or Platts MW Premium component of the aluminum price. Defendants inflated such prices to increasingly higher all-time record levels in an economic environment in which such levels made no sense.

79.   As a direct and foreseeable result, Plaintiff and members of the Nationwide Class were injured in their property including they had to pay artificially high Midwest Premium or Platts MW Premium prices for aluminum.

80.   Defendants' actions, as alleged, constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Under the Declaratory Judgment Act, Plaintiff and the Nationwide Class seek judgment and decree that Defendants have violated Section 1 of the Sherman Act.

81.   Defendants' violations are continuing and will continue unless enjoined by this Court.

## SECOND CLAIM FOR RELIEF
### For the Arkansas State Class –
### Violation of the ADTPA

82.   Plaintiff incorporates and re-alleges, as though fully set forth, every allegation set forth in the preceding paragraphs of this Complaint.

83.   During the Class Period, Defendants engaged in unfair, unconscionable, deceptive, or fraudulent acts or practices, or conduct that is immoral, unethical, oppressive, or conduct causing substantial injury to Plaintiff and the Arkansas State Class members. Defendants' monopolistic and anticompetitive actions, which were intentional and purposeful, complained of violate the ADTPA, Ark. Code Ann. § 4-88-101, *et seq.*, which is construed liberally to further its remedial purpose.

84.     During the Class Period, aluminum prices did not follow the laws of supply and demand existing in competitive markets, including markets in Arkansas.

85.     Correspondingly, Defendants possessed a gross inequality of bargaining power in the market for aluminum and refused to make Plaintiff or Arkansas State Class members aware of, or comprehend Defendants' antitrust violations.

86.     Defendants' misconduct as described constitutes an unconscionable, false or deceptive act or practice in business, commerce, or trade in violation of the ADTPA.  Ark. Code Ann. §§ 4-88-107, 108.

87.     As described in the foregoing paragraphs, during the Class Period Plaintiff and the other Arkansas State Class members were harmed by Defendants' violations of the ADTPA.  Plaintiff and the other Arkansas State Class members suffered injury to their business or property and have suffered damages in amounts undetermined.

### THIRD CLAIM FOR RELIEF
**For the Arkansas State Class - Unjust Enrichment**

88.     As the result of Defendants' illegal agreement, contract, combination, and conspiracy, Plaintiff and the Arkansas State Class members conferred a benefit upon Defendants, and Defendants received and retained this benefit under such circumstances it would be inequitable and unconscionable to permit Defendants to retain this benefit without paying its reasonable value to Plaintiff and the Arkansas State Class members.

89.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and Arkansas State Class members suffered injury and seeks an order directing Defendants to return to them what Defendants improperly obtained, plus interest.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1.      That the Court determine that the claims alleged under the Sherman Act and Arkansas state law may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

2.      That the unlawful agreement, conduct, contract, conspiracy or combination alleged by adjudged and decreed to be:

   a.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief; and

   b.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of Arkansas law as identified in the Second and Third Claims for Relief;

3.      That Plaintiff and the  members of the Arkansas State Class recover damages, obtain penalties, punitive or exemplary damages, and/or full consideration, where the laws so permits;

4.      That Plaintiff and all Class members  recover all other available equitable relief, including, where applicable, restitutionary disgorgement of profits obtained by Defendants because of their acts of unfair competition and acts of unjust enrichment.; That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged, or from entering into any other conspiracy alleged, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

5.     That Plaintiff and members of the Classes be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate after service of the initial Complaint in this action;

6.     That Plaintiff and members of the Classes recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

7.     That Plaintiff and members of the Classes obtain such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.     JURY TRIAL DEMAND

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury for all issues and claims so triable.

Dated:                                        Respectfully Submitted,
                                              KIRCH DRUTCHAS WARNER
                                              VALITUTTI & SHERBROOK


                                              Abraham Singer
                                              One Woodward Avenue, Suite 2400
                                              Detroit, MI 48226-5485
                                              Tel: (313) 965-7445
                                              Fax: (313) 965-7403
                                              abraham.singer@kitch.com

                                              EMERSON POYNTER LLP

                                              John G. Emerson
                                              830 Apollo Lane
                                              Houston, TX 77058
                                              Telephone: (281) 488-8854
                                              Facsimile (281) 488-8867
                                              jemerson@emersonpoynter.com

Scott E. Poynter
Christopher D. Jennings
William T. Crowder
Corey D. McGaha
1301 Scott Street
Little Rock, AR 72202
Telephone: (501) 907-2555
Facsimilie: (501) 907-2556
scott@emersonpoynter.com
cjennings@emersonpoynter.com
wcrowder@emersonpoynter.com
cmcgaha@emersonpoynter.com

David G. Scott
LAW OFFICE OF DAVID G. SCOTT,
PLLC
652 Cash Road SW
Camden, AR 71701
Telephone: (870) 836-8900
Facsimile: (870) 836-5900
David@davidgscott.com

Alan M. Mansfield
10200 Willow Creek Road, Suite 160
San Diego, CA 92131
Telephone: (619) 308-5034
Facsimile: (888) 341-5048
alan@clgca.com